ROBERT M. PARKER, Circuit Judge:
The Secretary of Labor appeals from a take-nothing judgment entered by the district court in this Fair Labor Standards Act (FLSA) case. 29 U.S.C. §§ 201, et seq. We affirm.

Procedural Background

Appellant, the Secretary of Labor, brought this FLSA action seeking to enjoin Appellee Express 60-Minutes Delivery Service, Inc. (“Express”) from violating the minimum wage, overtime compensation, and record keeping provisions of the Act. After a six-day bench trial, the district court concluded that no violation of the FLSA occurred because the courier delivery drivers were independent contractors. The district court further concluded that assuming that the drivers were employees, the Secretary failed to meet her burden of establishing that the requested damages were reasonable. Finally, the district court concluded that the Secretary failed to establish that any office workers were owed back wages.

Factual Background

A. Drivers
Express operates a cornier delivery service in Dallas and Tarrant Counties, Texas. Lynn Clayton is the president of Express, Charles Clayton is the vice-president, and Dee Ann Hopkins is the secretary-treasurer. Express contracts with various businesses, including law firms, hospitals, and laboratories, to deliver packages on a 24-hour basis in and around the Dallas-Fort Worth metropolitan area. Over 50% of the packages delivered by Express contain medical blood or tissue samples. Express averages around 525 deliveries each day. To make these deliveries, Express relies on about fifty drivers on its payroll at any given time. The drivers are recruited by Express through newspaper advertisements and word of mouth.
Customers of Express choose among various delivery options under which Express agrees to complete its deliveries within either one, two, or four hours of when an order is placed. Express uses a computer-dispatch system wherein orders are taken by customer service personnel over the telephone, entered into the computer, and transferred to dispatchers who assign the deliveries. The dispatchers communicate with the drivers by pager, two-way closed-channel radio, and telephone. While different factors guide their decisions, the dispatchers generally offer a delivery to the last on-duty driver to have received an offer who is closest to the pick-up point.
Express bills its customers based upon several factors including the size of the package, the priority of its delivery, and the distance between the pick-up and delivery point. Express negotiates special flat rates for approximately twenty-two regular customers. Express also negotiates with its customers over how much waiting time they will be allotted without additional charge.
Potential drivers are required to attend an orientation session at which they must sign an “Independent Contractor Agreement” *302 providing that they will make deliveries for Express using their own vehicles in exchange for receiving a commission for each delivery equal to a percentage of the customer’s cost. Under the agreement, drivers also pay the costs of their gasoline, vehicle maintenance, and insurance. Most drive a vehicle that they also use personally.
The “Independent Contractor Agreement” also provides that drivers will furnish their own uniforms, radios and pagers, as well as the biohazard bags and dry ice required for transporting medical samples. These items are supplied to the drivers by Express, which leases some of the items to the drivers and deducts the cost from their first few paychecks. Drivers supply their own dollies and MAPSCOs, and, if needed, their own tarps and cords for covering and securing items.
The drivers can and do negotiate for increased commissions, but most drivers do not negotiate their commissions. The drivers have no input into how Express’s business is conducted, the amount charged its customers, or the allocation or frequency of deliveries.
The drivers may use only those radios supplied by the company, because the radios operate on a private channel that Express licenses from the Federal Communication Commission. Most drivers wear a uniform consisting of a blue shirt and khaki pants. One shoulder of the shirt has a patch with an Express logo and the other shoulder sports an “Independent Contractor” patch. Uniforms are not required, but preferred.
In signing the “Independent Contractor Agreement,” a driver agrees to apply to become a notary public and to provide notary service to Express and its customers free of charge. Express supplies the drivers with the notary application, and deducts the cost for the notary bond and stamp from each driver’s first ten paychecks. Although not required, most drivers become notaries.
Pursuant to their contracts, drivers agree to make themselves available to work on-call for Express’s 24-hour delivery service. A majority of the drivers who testified stated either that they were required to work on-call or that they had no input into when their on-call time was scheduled. Express posts the on-call schedules at its offices and informs drivers that if unable to work, they are responsible for finding a replacement.
Drivers work for Express for varying lengths of time, with the majority working for relatively short periods. Several drivers testified that they had worked for other courier companies in the Dallas-Fort Worth area either prior to or after working for Express. Only one driver testified that he worked for another courier company while working for Express. The “Independent Contractor Agreement” does not contain a covenant-not-to-compete.
No prior experience is necessary to become a courier driver, but couriers need to be able to drive, read maps, and be courteous to customers. By using their judgment as to the best routes available and their knowledge about area traffic patterns, drivers may earn more money because they can make their deliveries faster and be available to make more deliveries.
Under the terms of the contract, the drivers have the right to accept or reject individual offers of delivery jobs, and have no obligation to accept any specified number of jobs during any given period. Drivers confirmed that they could decline offers without being-subjected to retaliation.
In addition to the drivers that Express considers independent contractors, the company employs four drivers it considers employees. The employee-drivers run errands for Express and make routine deliveries when the office is busy. They attend the same initial orientation session as the other drivers. Unlike the contract drivers, the employee-drivers (1) report for work at a specified time; (2) are paid by the hour; (3) work a set number of hours that are determined by Express; (4) are required to wear a uniform; (5) are provided with a company vehicle and all of the necessary tools of the trade; (6) are reimbursed for expenses; (7) are not allowed to turn down deliveries; and (8) are under the control and supervision of Express.
*303 B. Office Workers
The Secretary sought to establish an overtime claim on behalf of eleven office workers at Express. During her investigation, the Secretary determined that clerks worked fifty-five hours a week but were not being paid overtime compensation for all hours worked over forty. Lynn Clayton testified that much of the data on which the Secretary’s calculations were based was incorrect. Specifically, the employment dates of a number of individuals for whom overtime was claimed was incorrect and in computed damages, a fifty-five hour work week was assumed rather than the hours actually worked. The district court found that the Secretary’s calculations on this claim were neither reliable nor accurate, and that the Secretary failed to present sufficient credible evidence to support claims for back wages for the eleven office workers.

Analysis

A. Drivers
To determine employee status under the FLSA, we focus on whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he or she renders his or her services. Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1043, 1054 (5th Cir.1987). In other words, our task is to determine whether the individual is, as a matter of economic reality, in business for himself or herself. Donovan v. Tehco, Inc., 642 F.2d 141, 143 (5th Cir.1981). To aid us in this task, we consider five factors: the degree of control exercised by the alleged employer; the extent of the relative investments of the worker and alleged employer; the degree to which the worker’s opportunity for profit and loss is determined by the alleged employer; the skill and initiative required in performing the job; and the permanency of the relationship. Reich v. Circle C. Investments, Inc., 998 F.2d 324, 327 (5th Cir.1993). No single factor is determinative. Id.
We review the district court’s findings as to these five factors for clear error, but we review the district court’s ultimate determination of employee status de novo. Id.
1. Degree of control exercised by the alleged employer
The district court found that Express had minimal control over its drivers. We agree. The drivers set their own hours and days of work and can reject deliveries without retaliation. It is preferred that drivers wear a uniform and become notaries, but it is not required of all contract drivers. The drivers can work for other courier delivery systems, and the “Independent Contractor Agreement” does not contain a covenant-not-to-compete. Although the drivers are required to attend an orientation session and required to be on-call, these facts do not outweigh the other facts indicating a lack of control and independent contractor status. This result is even clearer when one contrasts Express’s employee-drivers who, unlike contract drivers, report for work at a specified time; are paid by the hour; work a set number of hours that are determined by Express; are required to wear a uniform; are not allowed to turn down deliveries; and are under the control and supervision of Express.
The degree-of-control factor points toward independent contractor status. Such a finding by the district court is not clearly erroneous.
2. Relative investment of worker and alleged employer
The district court found that the investment on the part of the drivers was significant. The district court first pointed out that Express does not provide drivers with any equipment—drivers were required to purchase or lease all the necessary tools of the trade including a vehicle, automobile insurance, dolly, MAPSCO, tarp, two-way radio, pager, and a medical delivery bag. The drivers also were responsible for all fuel, maintenance, and depreciation of their vehicles.
The Secretary counters that most drivers use their automobiles for personal and recreational purposes as well as for business, so that the capital risk on the part of the drivers is not substantial. Further, the Secretary argues that the relative investment, of *304 Express far exceeds that of the drivers, explaining that Express operates offices in two locations, uses a sophisticated computer system, purchases the equipment that it leases to its drivers, pays to license a closed-channel radio frequency from the Federal Communications Commission, and pays the salaries of twenty-five office employees. While the Secretary did not discuss in her brief the dollar amount of investment of Express, an independent review of the record reveals the following:
a. monthly lease on Fort Worth office = $1500-$1900
b. monthly lease on Dallas office = several hundred dollars
c. 60-65 radios at $600 a piece
d. air time for radio = $17 per month for each radio
e. biweekly payroll = approximately $19,-000
f. four vehicles = approximately $14,000 each
g. fax machine = $250
h. computer system = $25,000
R.Vol. XI-117; XII-86-91.
The relative investment by Express is indeed significant. Although the driver’s investment of a vehicle is no small matter, that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes. In Carrell v. Sunland Construction, Inc., 998 F.2d 330 (5th Cir.1993), the court found that welders were independent contractors partly because the welders invested an average of $15,000 each for welding equipment. There was no indication in Carrell that the welding equipment also was being used for personal purposes. Accordingly, the capital risk in Carrell was much greater. In Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1051 (5th Cir.1987), the court noted that a fireworks stand operator who used a computer to assist him while working involved no investment because he originally had purchased the home computer for school work. Even considering the additional maintenance on a vehicle which is used for a delivery service, we nonetheless conclude that the district court clearly erred in finding the drivers’ relative investment to be significant.
The district court also concluded that, although no direct testimony was presented on this point, the aggregate investment of all the contract drivers is substantially more than that of Express. However, we find no support for the application of an aggregation principle with respect to the relative investment factor. See, e.g., Carrell v. Sunland Construction, Inc., 998 F.2d 330 (5th Cir.1993) (court of appeals did not combine the welder’s average individual investment of $15,000 in trucks, machines, and tools when considering the relative investment factor).
The relative investment factor weighs in favor of the Secretary and toward employee status.
3. Degree to which employee’s opportunity for profit and loss is determined by the alleged employer
The district court found that the drivers are compensated on a commission basis. According to the district court a driver’s profit or loss is determined largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business. The district court observed that the drivers who made the most money appeared to be the most experienced and most concerned with efficiency, while the less successful drivers tended to be inexperienced and less concerned with efficiency.
Although the Secretary maintains that Express controls customer volume and the amount charged to customers, we cannot say that the district court clearly erred in finding that the drivers’ opportunity for profit and loss was determined by the drivers to a greater degree than Express. This is especially true because the drivers had the ability to choose how much they wanted to work and the experienced drivers knew which jobs were most profitable.
This factor points toward independent contractor status. The district court did not clearly err.
*305 4. Skill and initiative required
The district court found that once a job is offered to the driver, the driver is not told which route to take—the driver must rely on his own judgment, knowledge of traffic patterns and road conditions in the Dallas-Fort Worth metroplex, ability to read a MAPSCO, and ability to anticipate the need for an alternate route. According to the district court, experienced drivers possess specialized skills beyond that of merely driving an automobile, and more experienced drivers tended to make more money than less experienced drivers.
The Secretary argues that the contract drivers are more like wage earners than independent entrepreneurs seeking a return on their risky capital investment. The Secretary is correct. In Mr. W Fireworks, 814 F.2d at 1053, we explained that “initiative, not efficiency, determines independence.” In that case, the court found clearly erroneous the district court’s finding that fireworks stand operators had the skill and initiative indicative of independent contractors. In doing so, the court referred to Usery v. Pilgrim Equipment Co., 527 F.2d 1308, 1314 (5th Cir.1976), where the court reasoned that “routine work which requires industry and efficiency is not indicative of independence and nonemployee status.” The court further explained in Mr. W Fireworks that the operators were unable to exert initiative as “all major components open to initiative—advertising, pricing, and most importantly the choice of fireworks’ suppliers with which to deal are controlled by Mr. W.” Mr. W. Fireworks, 814 F.2d at 1053.
As we found in Pilgrim, Equipment, the “key missing ingredient in the lower court’s' determination is initiative.” 527 F.2d at 1314. The district court did not discuss initiative during its evaluation of this factor. We agree with the Secretary that the skill and initiative factor points toward employee status. The district court clearly erred in finding to the contrary.
5. Permanency of the relationship
The Secretary conceded at oral argument that the district court correctly determined the permanency issue. We agree. The majority of drivers work for Express for a short period of time. Drivers are able to work for other courier delivery companies, and the “Independent Contractor Agreement” does not contain a covenant-not-to-compete. The permanency factor points toward independent contractor status.
6. Other factors
Both sides encourage the. court to look to other factors in addition to the preceding five factors. The Secretary emphasizes that the work performed by the drivers is an integral and indispensable part of Express’ business. Express argues that the contract provided that the drivers were independent contractors and the drivers’ uniforms indicate same.
The determination of employee status is very fact intensive, and “as with most employee-status cases, there are facts pointing in both directions.” Carrell v. Sunland Construction, Inc., 998 F.2d 330, 334 (5th Cir.1993). In this case, three of the five traditional factors point toward independent contractor status. We conclude that the district court did not err in finding that the drivers were independent contractors.
We are confident in this result not only because the various factors weigh in favor of independent contractor status, but also because of Supreme Court precedent with respect to this issue. In United States v. Silk and Harrison v. Greyvan Lines, Inc., 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), a consolidated case, the court concluded that the drivers were independent contractors. In Silk, Albert Silk, doing business as Albert Silk Coal Co., sold coal at retail. His coal-yard consisted of two buildings, one for an office and the other a gathering place for workers. Silk owned no trucks himself but contracted with workers who owned their own trucks to deliver coal at a uniform price per ton. When an order for coal was taken in the office, a bell rang in the building used by the truckers. The truckers voluntarily adopted a call list upon which their names came up in turn, and the top man on the list had the opportunity to deliver coal. The truckers could and often did refuse to make a *306 delivery without penalty. The truckers were not instructed how to do their jobs, but were merely given a ticket telling them where the coal was to be delivered and whether to collect the charge. Any damage caused by the truckers were paid by the company. The truckers could go as they please and could haul for others when they pleased. The truckers paid all expenses of operating their trucks.
Greyvan Lines involved an interstate trucking business carrying mostly household furniture. Here the truckers were required to haul exclusively for Greyvan; furnish their own trucks and necessary equipment; furnish their own insurance; pay for all loss or damage to shipments; pay all expenses of operation; indemnify the company for any loss caused by the truckers; paint the designation “Greyvan Lines” on their trucks; collect all money due the company from shippers or consignees; personally drive their trucks at all times or be present on the truck when a competent relief driver was driving; and follow all rules, regulations, and instructions of the company. As remuneration, the truckers received from the company a percentage of the tariff charged by the company. The contract was terminable at any time by either party. A contract between the company and Local No. 711 of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America was in effect.
In both Silk and Greyvan Lines, the Court concluded that the truckers were independent contractors. The Court reasoned that these drivers owned their own trucks and were small businessmen. The control exercised, the risk undertaken, and the opportunity for profit from sound management led the Court to conclude that the truck drivers were independent contractors. In Greyvan Lines, the drivers were required to haul exclusively for the company and to paint the company logo on their vehicles; nonetheless, the Supreme Court concluded they were independent contractors. Comparatively, it is easier to conclude independent contractor status for the drivers in the case at bar.
Finally, the Secretary maintains that the drivers in this case are analogous to pieceworkers who have been held to be employees in numerous instances. See, e.g., McLaughlin v. Seafood, Inc., 867 F.2d 875 (5th Cir.1989) (seafood backers, pickers, and peelers are employees under FLSA); Usery v. Pilgrim Equipment Co., 527 F.2d 1308 (5th Cir.1976) (operators of laundry pickup stations are employees under FLSA); Dole v. Snell, 875 F.2d 802 (10th Cir.1989) (cake decorators are employees under FLSA). We disagree. More analogous to the Express contract drivers are the welders in Carrell and the truck drivers in Silk and Greyvan Lines.
The conclusion of the district court that the drivers were independent contractors is affirmed. Accordingly, we need not address whether the Secretary met her burden of establishing that the requested damages were reasonable.
B. Office Workers
Section 207 of the FLSA provides in pertinent part:
... [N]o employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half the regular rate at which he is employed.
29 U.S.C. § 207(a)(1). The Secretary claims that office workers at Express were not paid for their overtime worked. It is well-settled that the Secretary’s burden is met if it is proved that the employee has in fact performed work for which he or she was improperly compensated and if the employee produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. See Reich v. Gateway Press, Inc., 13 F.3d 685, 701 (3d Cir.1994) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)).
The Secretary’s claim for back wages was supported at trial by the testimony of Shirley Kenyon who presented an exhibit purporting to reflect the overtime due these employees. Kenyon’s testimony was rebutted by Lynn Clayton’s testimony which indicated that the employment dates Kenyon used were incor *307 rect and that Kenyon assumed that each employee worked a 55-hour week, rather than the 45-hour week actually worked. Lynn Clayton further testified that her office employees were being paid time and a half for overtime hours worked prior to the Secretary’s investigation. Although Clayton had changed her method of record keeping, she testified that the office employees were being paid the same amount today as they were getting paid before the Secretary’s investigation. R. Vol. XI-214-15. The district court concluded that the Secretary failed to present sufficient credible evidence to support claims for back wages for the office workers. We perceive no error in this conclusion, and the Secretary fails to point to any evidence in the record and fails to cite any binding precedent to support its position that a violation of the Act occurred. The Secretary’s citation of Nimn’s Battery & Electric Co. v. Goldberg, 298 F.2d 516 (5th Cir.1962) offers no assistance to the court because in that case the Secretary introduced evidence into the record indicating that no explicit understanding existed between the parties as to the existence of a regular wage rate that is increased for overtime hours. The court pointed to abundant testimony by numerous employees that they were not told what their hourly rate of pay was. The Secretary points to no such evidence in the record and makes no inference in her brief to that effect. Based upon the limited briefing and record citation on this issue, the court cannot discern how the Secretary proved that a violation of the Act even occurred.
Because we agree with the district court that the Secretary failed to provide sufficient evidence to support her claims, we need not address whether the Secretary produced sufficient and accurate evidence of damages.[1]
For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED.