# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 28, 2019

Lyle W. Cayce
Clerk

No. 17-51089

WILLIAM PARRISH; JOSHUA D. ELLESTAD; MARIO ALFARO; THOMAS J. BECKETT; MATTHEW S. ROBBINS,

Plaintiffs - Appellees

v.

PREMIER DIRECTIONAL DRILLING, L.P.,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, BARKSDALE, and HO, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Premier Directional Drilling, L.P., challenges the summary judgment awarded William Parrish, Joshua D. Ellestad, Mario Alfaro, Thomas J. Beckett, and Matthew S. Robbins pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–19. At issue are the district court's determining, as a matter of law: plaintiffs were employees, not independent contractors; and a three, instead of two, year limitations period for awarding damages was applicable, but without ruling Premier acted willfully. VACATED and RENDERED.

No. 17-51089

I.

Premier, which specializes in directional drilling for oil, is headquartered in Houston, Texas. As described by Premier's vice president: "Directional drilling is the process of drilling a well . . . down a path that begins vertical to the surface and, then, at the 'kickoff point' drills at an angle horizontal to the surface". And, as noted by one of Premier's employees, sometimes the target oil is "thousands of yards below ground and up to several miles distant from the drilling rig location".

Directional drilling is useful in avoiding obstructing subterranean objects, and can lead to efficient oil extraction. As part of the directional-drilling process, Premier utilizes directional-driller-consultants (DD) and measurement-while-drilling-consultants (MWD).

DDs and MWDs have different jobs. A DD advises the oil company's driller how best to effectuate the well plan—provided to the DD—that involves a directional drill. As indicated, oil companies perform the drilling themselves. Being contrary to Premier's policy to do so, DDs generally do not operate the drill.

A MWD takes measurements during the directional drill that are provided to the DD and provide a basis for the DD's opinion. An error in the directional-drilling advice by the DD can lead to Premier's losing a significant amount of money—sometimes hundreds of thousands of dollars.

Plaintiffs are DDs. Some DDs are classified by Premier as employees; some, independent contractors (IC). Plaintiffs claim they were mis-classified as ICs, and are, instead, employees to whom the FLSA applies.

Premier utilizes unrelated staffing companies to hire ICs. Those companies enter into arrangements with ICs, which may include non-disclosure agreements, and are also the entities through which Premier paid

2

plaintiffs' consulting businesses.  (Plaintiffs created consulting businesses through which they operate as putative ICs.)

Again, Premier's DDs advise it how to perform a directional drill, which it undertakes.  Premier, formed in 2012, has always used ICs to some extent.  But, according to Premier's CFO, "[i]n 2015 there was a drastic downturn in the oilfield industry and Premier was forced to significantly reduce its workforce from 150 employees to just 30".  Then-Premier employees, plaintiffs Alfaro and Robbins were laid-off that year.  But Premier did not let them go, entirely.  Both Alfaro's and Robbins' termination paperwork show Premier was "[s]wapping" or "mov[ing]" them to become ICs.  Plaintiffs Parrish, Beckett, and Ellestad worked as putative ICs for Premier, but it does not appear they were subject to the 2015 transition.

Not surprisingly, IC DDs and employee DDs have essentially the same job duties.  Premier's vice president agreed that "the only difference between an [IC DD] and an employee [DD] . . . is their ability to turn down work" "[a]nd negotiate their pay".

All DDs are supervised by a coordinator, but also perform their task with little to no intervention.  And, all DDs undergo mandatory safety training.  Premier has a drug-and-alcohol policy, and ICs must comply with drug testing if required by Premier.  All DDs have to use the same WinSERVE program (computer program used during directional drilling), which has an annual cost somewhere between $4,000 to $5,000.  Regardless if an IC had WinSERVE on his own computer, Premier would have a copy of the WinSERVE program available at the job-site for use by employees and ICs.

Employees, as salaried workers, could not decline to work a project.  ICs could decline to do so, but accept others.  For example, Parrish would turn down jobs when he was out of town, and Premier would offer him other jobs later.  Additionally, ICs would coordinate with each other or Premier when

they left a rig site. For an employee to request vacation time, he had to complete a form; ICs, to call Premier.

IC DDs often bring their own tools, but not always. For example, Premier ensured its drill sites had a laptop with the appropriate software available for use. Parrish was one putative IC who used a Premier-provided laptop. Premier also ensured its DDs had fire-retardant clothing, if they did not have it already. It is unclear the extent to which this clothing featured Premier's logo or designated who was an IC.

Premier also provides the MWDs to the DDs; according to Premier's CEO, MWDs are "traditionally" paid by Premier. As noted earlier, MWDs provide the DDs the measurement information often crucial to the DDs' ability to perform their job. While MWDs are not needed on some drills, they are essential on others. MWD services were present on most of Premier's directional-drilling projects. The equipment used by MWDs is very expensive, and not provided by DDs. For example, the EVO tool (utilized by MWDs to obtain data from the well) cost around $800,000.

Premier's ICs are paid differently from its employees. According to Premier's CFO, "[e]mployee [DDs] are paid a salary plus a day bonus for each day they're on the job", "car allowance", "per diem" and "benefits". On the other hand, IC DDs are paid by the job, but receive mileage for travel. According to Premier's CFO, they are "covered by Premier's general liability insurance while they're on the job".

While employees could be promoted within Premier, plaintiffs could not. Nevertheless, plaintiffs, as putative ICs, could be elevated to a higher pay classification based on experience. For example, if an IC advanced from Contract-DD2 to Contract-DD3, on the pay chart effective 20 January 2015, the IC would receive $1,170, instead of $1,080, per day. The decision whether to move an IC up the pay scale was made by a Premier manager. While

plaintiffs could hypothetically negotiate for higher pay, it is unclear how often they did so.

Similarly, Premier's DD employees' pay scale was listed in the same format, even on the same page, as the ICs' pay scale. Employees could similarly be upgraded from DD-2 to DD-3 and receive a higher base salary and daily bonus. These pay scales were amended over time.

Premier did not use a bidding system to hire ICs. Instead, it would select which IC it wished to use for the job, and a coordinator would call to offer the project. Occasionally, ICs would call Premier when "hungry" and request work, even if paid less.

In May 2016, Parrish filed this FLSA collective action against Premier, claiming it "misclassified [him and all others similarly situated] as independent contractors" and failed to properly compensate them for overtime, as required by 29 U.S.C. §§ 206, 207, 215(a)(2), and alleging Premier did this "knowingly, willfully, or in reckless disregard". The complaint requested relief in the form of, *inter alia*, unpaid compensation.

Plaintiff was granted leave to seek additional similarly-situated opt-in plaintiffs. But, as of the court's awarding summary judgment, there were only four opt-in plaintiffs; it appears approximately 90 received notice. (Seven other opt-in plaintiffs withdrew their consent.)

The parties in July 2017 filed cross-motions for summary judgment. That November, the district court, *inter alia*, granted plaintiffs' motion and denied Premier's. *Parrish v. Premier Directional Drilling, L.P.*, 280 F. Supp. 3d 954, 975 (W.D. Tex. 2017).

In its comprehensive and detailed opinion, the district court used the standard format—as is done in this opinion—for evaluating five factors relating to the employment-status determination, as provided in *United States v. Silk*, 331 U.S. 704 (1947). *Parrish*, 280 F. Supp. 3d at 961–70. As discussed

*infra*, the court concluded one factor supported IC status; two, employee status; and two were neutral.  *Id.*  And, as is standard, it also considered factors not explicitly part of the *Silk* test.  *Id.* at 968–69.

Based on its analysis of all of the factors, the court concluded plaintiffs were employees:  "While there are certainly facts supporting the classification of [p]laintiffs as [ICs], the fact that employee DDs and IC DDs were treated the same, and supervised in the same manner, with no appreciable differences other than how they were compensated, factors most heavily in the [c]ourt's analysis here".  *Id.* at 969.  Using a three-year limitations period, the court awarded plaintiffs $363,422.00:  $181,711.00 in compensatory, and $181,711.00 in liquidated, damages.  *Id.* at 975.  (The court did not make a willfulness finding for applying the three-year period.  *See generally id.*  FLSA claims are "subject to a two-year [limitations] period for ordinary, but a three-year period for willful, violations".  *Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015) (citing 29 U.S.C. § 255(a)).)

## II.

As addressed *infra*, whether a worker is an employee for FLSA purposes is a question of law.  *E.g.*, *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (5th Cir. 1987).  And, our court "review[s] *de novo* a district court's legal conclusion as to employment status in a grant of summary judgment".  *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (citing *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993)).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating such a motion, "[t]he evidence should be viewed in the light most favorable to the non-moving party, and this court should 'refrain from making credibility

determinations or from weighing the evidence'". *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012) (citation omitted).

Importantly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

"As to materiality, the substantive law will identify which facts are material." *Id.* at 248. This means "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment". *Id.* As for whether a dispute is genuine, "the dispute about a material fact is 'genuine[ ]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

Our court has addressed the various fact and legal questions present in an FLSA action. *Brock*, 814 F.2d at 1044–45. Unlike the summary judgment at issue, the appeal in *Brock* was from a bench trial. *Id.* at 1043. The issue presented was "whether the operators of [the company's] fireworks stands [were] 'employees' within the meaning of the FLSA". *Id.*

In *Brock*, our court noted: "There are . . . three types of findings involved in determining whether one is an employee within the meaning of the Act". *Id.* at 1044. "First, there are historical findings of fact that underlie a finding as to one of the five *Silk* factors". *Id.* Next, "there are those findings as to the *Silk* factors themselves". *Id.* This means "[f]indings as to [the *Silk* factors] are plainly and simply based on inferences from facts and thus are questions of fact that we may set aside only if clearly erroneous". *Id.* (citations omitted). (This step, of course, is not used in deciding whether a party is entitled to

No. 17-51089

summary judgment, as discussed *infra*.)  Finally, "[t]he ultimate finding as to employee status is not simply a factual inference drawn from historical facts, but more accurately is a legal conclusion based on factual inferences drawn from historical facts".  *Id.* at 1045.  Accordingly, "the ultimate determination of employee status is a finding of law subject to *de novo* consideration by this court".  *Id.* (citation omitted).

Based on finding "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers", Congress enacted the FLSA in 1938.  29 U.S.C. § 202(a).  Subject to exceptions, the statute defines "employee" as "any individual employed by an employer".  *Id.* § 203(e)(1).

"Given the remedial purposes of the legislation, an expansive definition of 'employee' has been adopted by the courts."  *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir. 1976); *see also McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989).  And, it is well-established that "[t]he common law concepts of 'employee' and '[IC]' have been specifically rejected as determinants of who is protected by the [FLSA]".  *Usery*, 527 F.2d at 1311 (footnote omitted).

The FLSA requires overtime pay when "a workweek [is] longer than forty hours".  29 U.S.C. § 207(a)(1).  If an employer violates the overtime-compensation requirement, it is "liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages".  *Id.* § 216(b).

"Generally, FLSA claims are subject to a two-year statute of limitations, however the limitations period is three years for willful violations."  *Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 248 (5th Cir. 2016) (footnote omitted) (citing 29 U.S.C. § 255(a)).  As discussed, the district court awarded damages

using the three-year limitations period, but did not make a willfulness finding. Premier challenges the damages on that basis. Because, as discussed *infra*, plaintiffs were ICs, it is not necessary to reach the damages issue.

Plaintiffs must prove four elements to make their *prima facie* case: "(1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due". *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citations omitted). Each element must be proven by a preponderance of the evidence. *Id.* If "the employee establishes a prima facie case, the burden then shifts to the employer to 'come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence'". *Id.* (citation omitted).

Other than challenging the above-discussed three-year limitations period used for awarding damages, which, as discussed, we need not reach, Premier's appeal focuses solely on the first of the above elements: whether "there existed an employer-employee relationship". *Id.* (citations omitted). In that regard, the pertinent question is "whether the alleged employees, as a matter of 'economic reality,' are 'economically dependent' on the business to which they supply their labor and services". *Brock*, 814 F.2d at 1043. This "diagnosis is not always easy to perform". *Id.* Needless to say, it can be "very fact dependent", with "facts pointing in both directions". *Carrell*, 998 F.2d at 334. "Essentially, our task is to determine whether the individual is, as a matter of economic reality, in business for himself." *Id.* at 332 (citing *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. Unit A Apr. 1981)).

In FLSA actions, our court primarily uses the earlier-referenced *Silk* factors to guide the employee *vel non* analysis. *See generally Silk*, 331 U.S.

704. Those "five non-exhaustive factors" include: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship". *Hopkins*, 545 F.3d at 343 (citing *Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998)).

As noted, "[n]o single factor is determinative". *Id.* (citing *Brock*, 814 F.2d at 1043–44). And, obviously, the factors should not "be applied mechanically". *Brock*, 814 F.2d at 1043; *see also Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (applying the "economic reality" test in the ADEA context while noting "the test cannot be rigidly applied" and "[i]t is impossible to assign to each of these factors a specific and invariably applied weight").

Instead, the focus is on "an assessment of the 'economic dependence' of the putative employees, the touchstone for this totality of the circumstances test". *Brock*, 814 F.2d at 1043–44 (citations omitted); *Usery*, 527 F.2d at 1311 ("It is dependence that indicates employee status. *Each test must be applied with that ultimate notion in mind.*" (emphasis added)). Therefore, "facile labels and subjective factors are only relevant to the extent that they mirror 'economic reality'". *Brock*, 814 F.2d at 1044 (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). Stated differently, "it is not what [plaintiffs] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive". *Id.* at 1047 (emphasis in original) (citations omitted); *see also id.* at 1053 ("[O]nly the economic realities are legally relevant". (citation omitted)); *Usery*, 527 F.2d at 1312 ("The controlling economic realities are *reflected by the way one actually acts.*" (emphasis added) (footnote omitted)).

No. 17-51089

A.

First considered is whether, in the light of the summary-judgment record at hand, this action is appropriate to be decided by summary judgment. *See generally Anderson*, 477 U.S. 242. Along that line, Premier not only challenges the summary judgment awarded plaintiffs, but also requests judgment be rendered in its favor. "When parties file cross-motions for summary judgment, 'we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" *Duval v. N. Assurance Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013) (quoting *Ford Motor Co. v. Tex. Dept. of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)). Our inquiry in evaluating a summary-judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law". *Anderson*, 477 U.S. at 251–52.

As noted, Premier urges our vacating the judgment for plaintiffs and rendering judgment in its favor. In the alternative, it urges remand for trial. Plaintiffs, likewise, assert this action is appropriate for a summary judgment, which they maintain, should be affirmed.

Like every FLSA action in a similar posture, the instant cross-motions for summary judgment are "very fact dependent". *E.g., Carrell*, 998 F.2d at 334; *Thibault v. Bellsouth Telecomm.*, 612 F.3d 843, 848 (5th Cir. 2010) (describing this analysis as "highly dependent on the particular situation presented" (citing *Carrell*, 998 F.2d at 334)). As discussed, awarding summary judgment requires, *inter alia*, no "genuine dispute as to any material fact". Fed. R. Civ. P. 56(a). Accordingly, as in this instance, summary judgment on FLSA employee status can be granted when "there are facts pointing in both directions", *Carrell*, 998 F.2d at 334, so long as they do not generate a genuine dispute of material fact. That is the situation at hand.

In other words, after reviewing the record, we cannot discern any fact that is both genuinely disputed and could change the outcome of this proceeding (no genuine dispute of material fact, as defined *supra*).  There being no genuine dispute of material fact, we turn to the second prong for summary-judgment review:  whether plaintiffs are, or Premier is, "entitled to judgment as a matter of law".  *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(a).

B.

Each of the five, non-exhaustive *Silk* factors is evaluated, followed by consideration of other factors.

1.

Again, the five *Silk* factors are: "degree[ ] of control, opportunities for profit or loss, investment in facilities, permanency of relation[,] and skill required in the claimed independent operation".  *Silk*, 331 U.S. at 716.  Again, consistent with the requisite *de novo* review for summary judgment, and, in the process, only issues of law being decided, no clear-error analysis is made in evaluating the factors.

a.

First considered is "the degree of control exercised by" Premier over plaintiffs.  *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303).  The district court concluded this factor was neutral.  280 F. Supp. 3d at 963 (balancing the control exerted *via* the work schedules and personnel policies with the lack of control over training and lack of "significant direct supervision at the work site").  Based on our *de novo* review, the control factor favors IC status.

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that [the individual] stands as a separate economic entity."  *Usery*, 527 F.2d at 1312–13; *Hopkins*, 545 F.3d at 343 (determining whether the employer "controlled the 'meaningful' economic

aspects of the business" (citing *Brock*, 814 F.2d at 1049)).   This means we determine whether the worker has a "viable economic status that can be traded to other . . . companies", keeping in mind that "lack of supervision [of the individual] over minor regular tasks cannot be bootstrapped into an appearance of real independence".   *Usery*, 527 F.2d at 1312.   "It is not significant how one 'could have' acted under the contract terms".   *Id.*; *but see Herman*, 161 F.3d at 303 (considering the contract did "not contain a covenant-not-to-compete").

Premier relies upon plaintiffs' being "free to accept or reject any project" and "controll[ing] the manner and method of their work".   Plaintiffs respond: "Premier demanded [they] comply with its company policies and procedures", including requiring "special permission" to simply leave the workplace and mandating certain reports be filed "in Premier's preferred format".   Additionally, plaintiffs assert a Premier employee instructs them "where their assigned job is and when they need to report for duty", what the well plan is, what equipment will be at the drill, who can operate the drill, and determines when a pay raise is in order.

As stated, the control factor leans in favor of IC status.   Premier did not dictate how plaintiffs completed the directional-drilling calculations.   This is similar to the situation in *Thibault*, in which the worker's supervisors "never specified how [he] should do [his primary task:] splicing" high-voltage cables. *Thibault*, 612 F.3d at 847.

Additionally, although plaintiffs were provided an already-designed well plan, they made that plan work.   In *Thibault*, the company provided the "blueprints", yet the worker was not held to be an employee.   *Id.* at 847, 851.

Nor are we persuaded by the mandated format of reports.   At the very least, turning in reports in the way a client wants them is good-client service. In any event, "meeting clients' specifications and keeping clients informed of

job progress is consistent with the 'usual path' of an [IC]". *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1315 (11th Cir. 2013).

The district court concluded this factor was neutral for primarily three reasons. 280 F. Supp. 3d at 963 (citing control over "work schedules", "personnel policies" like "drug testing and safety trainings", and the "non-disclosure agreements"). None of them reflects the requisite control in determining employee status.

Regarding the work schedule, plaintiffs did have certain assigned shifts; but, they did not have to accept a project. On occasion, Premier's ICs turned down projects without negative repercussion.

Further, it is quite understandable why Premier would need to know which DDs were working at any given time. DDs had to work in concert with the rest of the drilling operation. According to a declaration from Premier's vice president, DDs have to "make adjustments to the well plan given what the drill experiences in real time". Clearly, they could not show up at the drill site whenever they pleased. Given the cooperation required between DDs and drill operators, Premier had to know when DDs would be on-site.

Nor were plaintiffs employees because of safety training and drug testing. To the contrary, requiring everyone working at an oil-drilling site to be educated on safety protocol, and not be under the influence of illegal drugs, is required for safe operations. This is consistent with the Occupational Safety and Health Act: Premier had a duty to "furnish . . . a place of employment . . . free from recognized hazards that are causing or are likely to cause death or serious physical harm to [its] employees". 29 U.S.C. § 654. In that sense, an IC could be a hazard.

Although requiring safety training and drug testing is an exercise of control in the most basic sense of the word, *see Control*, Black's Law Dictionary (10th ed. 2014) (defining control as, *inter alia*, "the power or authority to

manage, direct, or oversee"), and something our court has considered previously, *see Hathcock v. Acme Truck Lines, Inc.*, 262 F.3d 522, 526 (5th Cir. 2001) (considering employer's required "drug testing"), it is not dispositive in this action because of the nature of the employment.  Requiring plaintiffs to undergo safety training and drug testing, when working at an *oil-drilling site*, is not the type of control that counsels in favor of employee status.

Neither does the existence of the non-disclosure agreement.  *Talbert v. Am. Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (noting existence of a confidentiality agreement, but stating "there is nothing in the confidentiality agreement that would have precluded . . . working for other . . . companies so long as . . . the terms of the agreement" were not violated).  The non-disclosure agreement does not require exclusive employment.  *Usery*, 527 F.2d at 1312–13.

b.

The second factor evaluated is "the extent of the relative investments of the worker and the alleged employer".  *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303).  The district court concluded "this factor favors . . . employee status" in this instance.  280 F. Supp. 3d at 965.  We reach the same conclusion, but, in this instance accord this factor little weight, in the light of the nature of the industry and the work involved.

Our court uses a side-by-side comparison method in evaluating this factor.  *Hopkins*, 545 F.3d at 344.  To do so, "we compare each worker's *individual* investment to that of the alleged employer." *Id.* (emphasis in original) (citing *Herman*, 161 F.3d at 304).  Accordingly, plaintiffs' investments are not aggregated.  *Id.*  In other words, "the amount the alleged employer and [each worker] each contribute to the specific job the [worker] undertakes" is compared.  *Thibault*, 612 F.3d at 847 (citing *Carrell*, 998 F.2d at 333).

Premier urges our circuit to abandon the side-by-side comparison of the worker's investments to the employer's investments, contending the comparison method was never mentioned in *Silk*. In *Silk*, the Court simply referenced "investment in facilities". *Silk*, 331 U.S. at 716.

We need not decide whether we even have the option to abandon the comparison, with doing so arguably being violative of our court's rule of orderliness: an earlier decision by our court cannot be overturned absent a change in law or Supreme Court or en-banc decision. *E.g., Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 591 (5th Cir. 2017). The well-established side-by-side comparison is beneficial to our analysis. *Usery*, 527 F.2d at 1313–14.

In the 1976 *Usery* opinion, the investments of the employer and the laundry workers were compared. *Id.* at 1313–14. The opinion noted the employer supplied "[a]ll investment or risk capital". *Id.* at 1314. (And our court did so while faithfully citing the *Silk* opinion. *Id.* at 1311 & n.9.)

More recent precedent has continued this long-accepted methodology. *See, e.g., Hopkins*, 545 F.3d at 344 (holding "[the employer's] greater overall investment in the business scheme convinces us that the relative-investment factor weighs in favor of employee status" (citation omitted)); *Brock*, 814 F.2d at 1052 ("The [workers'] relative investment must be compared with the investment of [the employer] in order to determine the degree of economic dependence." (citations omitted)).

Nonetheless, the side-by-side comparison approach does not always necessitate a holding of employee status. In *Carrell*, our court held plaintiffs were ICs despite the company's "obviously significant" "overall investment in each pipeline construction project". 998 F.2d at 333. Again, the evaluation of each *Silk* factor must be linked to the overall inquiry of "whether the alleged employees, as a matter of 'economic reality,' are 'economically dependent' on

the business to which they supply their labor and services". *Brock*, 814 F.2d at 1043.

Obviously, Premier invested more money at a drill site compared to each plaintiff's investments. 280 F. Supp. 3d at 964–65. Premier's provision of MWDs, and the attendant costs, were also critical to plaintiffs' being able to complete the job. As previously stated, MWDs provide DDs with the required data to effectuate the well plan. Further, the investment surrounding the MWDs was significant. *Usery*, 527 F.2d at 1314 ("But for [the employer's] provision of all costly necessities, these [workers] could not operate.").

As stated, this factor merits little weight in the light of the other summary-judgment-record evidence supporting IC-status.

c.

The third determination is "the degree to which the worker's opportunity for profit or loss is determined by the alleged employer". *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303). The district court concluded "this factor weighs in favor of employee status". 280 F. Supp. 3d at 966. We hold otherwise.

In evaluating this factor, it is important to determine how the workers' "profits [depend] on their ability to control their own costs". *Carrell*, 998 F.2d at 334. For that purpose, evidence gleaned from tax returns can be useful. *Id.* (The limited utility of such returns is described below.)

Premier relies heavily on plaintiffs' tax returns, in which they reported business profits and attendant expenses. As detailed below, some of the claimed expenses, as well as the profits, were quite significant. (Premier conceded at oral argument that no plaintiff lost money when considering solely the profits and expenses stemming from work with Premier.)

Premier has also emphasized plaintiff Ellestad's goat farm, which offset $190,000 in profits earned from Premier. Citing *Thibault*, Premier contends

plaintiffs' additional income and losses from other business ventures is relevant. In *Thibault*, our court considered plaintiff's professional-racing business venture, sales company, and commercial rental property when evaluating whether plaintiff was employed by defendant as a splicer. 612 F.3d at 849. Those entities and splicing are obviously different enterprises. *See id.* Our court emphasized that, "[w]*hen* he worked as a splicer, he *also* oversaw [his other businesses]". *Id.* (emphasis in original). Similarly, between jobs with Premier, Ellestad was able to work on his goat farm.

Plaintiffs respond by referring to *Brock*. There, our court determined the minimal income gained by plaintiffs from selling items in addition to their employer's product (fireworks) was irrelevant. *Brock*, 814 F.2d at 1049 ("The sale of such incidental items simply is irrelevant as a matter of law.").

On this record, *Thibault* is more on-point. Accordingly, we consider the losses sustained by plaintiffs' enterprises, such as the goat farm, as a part of the overall analysis of how dependent plaintiffs were on Premier.

In short, plaintiffs did have enough control over their profits and losses to have this factor support IC status. Although Premier had a set pay schedule for ICs based on their experience, plaintiffs made decisions affecting their expenses. *Thibault*, 612 F.3d at 848 (noting a nonemployee could "increase[ ] profits by controlling costs"); *Carrell*, 998 F.2d at 333–34.

And, they did not receive any pay from Premier when they were not working on one of its projects. This is unlike Premier's employees, who were paid even if they were not working on a project. The employees also received "a day bonus for each day they[ ] [were] on the job", a "car allowance", a "per diem", and benefits. On the other hand, Premier's ICs (including plaintiffs as putative ICs) were "reimbursed mileage to and from the job" and received a daily rate for pay. (Parrish's payment records, generated by one of the staffing

companies used by Premier, indicate his consulting company also received bonuses stemming from his work done at Premier.)

The rate of daily pay for an IC working for Premier could be quite high. While the range of pay varied, based on the time period, it could well exceed $1,000 per day, depending on the IC's level of classification. For example, Parrish's consulting firm, Parrish Consulting LLC, earned $230,033.30 in 2013. This figure included the per-day pay, a bonus, and mileage. In 2014, Parrish Consulting LLC earned even more—$279,777.31. In 2015, Parrish Consulting LLC reported a little over $40,000 in gross receipts and took over $30,000 in deductions.

Three other plaintiffs show a similar story (Robbins' tax returns are not in the record). In 2014, JD Ellestad Inc. reported almost $190,000 in gross receipts while also taking thousands of dollars in deductions through, *inter alia*, repairs/maintenance, depreciation, and employee-benefit programs. In 2015, Beckett's business, Beckett Energy Services LLC, reported over $120,000 in gross income with total expenses exceeding $30,000 covering deductions for, *inter alia*, travel, meals, and entertainment. Alfaro's 2015 taxes showed he earned over $130,000 in wages while also claiming losses in excess of $26,000 (such as depreciation, insurance, and travel).

For this factor, plaintiffs also point to their inability to subcontract as evidence of employee status. In support, they cite *Hopkins*, where our court noted the employer "controlled the hiring, firing, and assignment of subordinate agents", in ruling this "factor weigh[ed] in favor of employee status". *Hopkins*, 545 F.3d at 344–45. Preventing subcontracting is an exercise of control, but it is not dispositive here. Many times, as is the situation here, it is not unreasonable for a company to want to hire a specific person. This is especially the situation when the IC is being hired for his advanced skill and specialized expertise.

No. 17-51089

d.

Fourth considered are "the skill and initiative required in performing the job". *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303). The district court concluded "this factor [was] neutral". 280 F. Supp. 3d at 967. We hold it favors IC status.

As a part of this inquiry, whether plaintiffs have "some unique skill set, or some ability to exercise significant initiative within the business" is, for obvious reasons, evaluated. *Hopkins*, 545 F.3d at 345 (internal citations omitted); *see also Usery*, 527 F.2d at 1314 (ruling workers showed insufficient initiative when "[a]ll major components open to initiative . . . [were] controlled by [the employer]"); *Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 229 (5th Cir. 2016) (ruling "a reasonable jury could conclude that [plaintiff] 'exercise[d] significant initiative' as an installer" when "installers could receive more installation jobs, and thus more profits, based on their efficiency; that they could profit from performing custom work; that they could perform additional services for customers; and that they could control the days that they worked" (second alteration in original) (citation omitted)); *Thibault*, 612 F.3d at 847, 851 (holding "there [was] no summary judgment evidence sufficient to sustain a finding [plaintiff] was an employee" when splicers learned *via* "an informal apprenticeship" and their "success depended on their ability to find consistent work by moving from job-to-job"). Greater skill and more demonstrated initiative counsel in favor of IC status. *Carrell*, 998 F.2d at 333 (noting plaintiff exercised great skill in pipe welding and initiative in generating business, but initiative was more limited "once on a job").

But, "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status". *Usery*, 527 F.2d at 1314 (footnote omitted). Further, skills that are not "specialized" but rather are "common" to all employees in that position counsel against IC status. *Hopkins*,

545 F.3d at 345 (citation omitted).  Additionally, whether the worker has "customer rapport" is not germane to the analysis.  *Brock*, 814 F.2d at 1053. Again, the focus of this factor is linked to whether the worker was economically-dependent.  *Usery*, 527 F.2d at 1315.

i.

First considered is plaintiffs' skill.  The district court correctly noted plaintiffs "are highly skilled individuals who performed their directional drilling tasks using their own discretion".  280 F. Supp. 3d at 966. But, the court then concluded there were no "appreciable differences between IC DDs and those DDs employed by Premier".  *Id.* at 967.

We detail throughout this opinion, however, the numerous differences between employees and plaintiffs, and decline to require plaintiffs, as putative ICs, be more skilled than their employee counterparts.  By analogy, Premier contends "[a] company with a highly-skilled general counsel can still hire an outside lawyer as an [IC], even if the general counsel is a more skilled lawyer". The same principle applies here.  Plaintiffs' high-skill level, understood in the light of their complicated work, weighs heavily in favor of IC status.

ii.

Next considered is initiative.  Plaintiffs contend: "Premier eliminated all meaningful avenues for exercising initiative by using a no-bid project assignment system, supplying all necessary personnel and equipment, paying drillers using a fixed, experience-based pay scale, tying that day rate to a fixed 12-hour workday, and preventing [p]laintiffs from subcontracting their work".

Additionally, plaintiffs point to *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947).  There, the Court stated: "Where the work done, in its essence, follows the usual path of an employee, putting on an '[IC]' label does not take the worker from the protection of the [FLSA]." *Id.* at 729.  In *Rutherford*, the workers "work[ed] alongside admitted employees of the plant operator at their

tasks". *Id.* at 726. That an employer utilizes employees *and* ICs to do essentially the same job (as is the situation here) is relevant to the FLSA analysis. But, this simply weighs in overall analysis. Examples of using both employees and ICs to perform essentially the same task are so ubiquitous, it is unnecessary to recite here.

Premier contends plaintiffs did show initiative because they: "could ask for more money"; could "advertise their businesses to and work for Premier's competitors"; invested "in trucks, computers, clothing, and equipment"; and managed their own finances efficiently. On balance, we are less persuaded plaintiffs demonstrate the sort of initiative compelling nonemployee status. After all, at issue is not what plaintiffs could do, only what they did. *Brock*, 814 F.2d at 1047. And the other evidence is not very strong.

Nonetheless, this is viewed by the totality of the circumstances. *Brock*, 814 F.2d at 1043–44. Plaintiffs' specialized skill weighs heavily in our analysis and persuades us to hold this factor leans in favor of IC status.

e.

The fifth, and final *Silk* factor to be evaluated is "the permanency of the relationship". *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303). The district court concluded the "factor weighs in favor of [IC] status". 280 F. Supp. 3d at 968. Based on our *de novo* review, we reach the same conclusion.

In evaluating this factor in *Carrell*, 998 F.2d at 332, our court provided several relevant considerations. First, whether any plaintiff "worked exclusively" for Premier should be determined. *Id.* Although Premier contends plaintiffs *could* have worked for other directional-drilling companies, that is not a relevant concern. Again, the analysis is focused on economic reality, not economic hypotheticals. *See Hopkins*, 545 F.3d at 346. And plaintiffs generally did not contract with other directional-drilling companies.

Next, the total length of the relationship between Premier and plaintiffs is considered. *Carrell*, 998 F.2d at 332. In discussing circuit precedent, the district court stated: "where a plaintiff works for a defendant for ten months, the engagement begins to resemble an employment relationship". 280 F. Supp. 3d at 967–68 (collecting opinions). Although the court seemed to rely on a ten-month rule, it did not establish ten-months as a bright-line rule, and neither do we. *See id.* The inferences gained from the length of time of the relationship depend on the surrounding circumstances.

Plaintiffs contend the court erred by giving some of them credit for time spent as Premier employees (in addition to time spent as Premier's putative ICs), but not giving that same credit to the other plaintiffs. But even under plaintiffs' calculations, only three of the five worked for Premier for ten months or longer. In the past, our court has noted whether workers have "previously served as . . . employees and are performing essentially the same functions as [ICs]" in considering the permanency of the relationship. *Usery*, 527 F.2d at 1314 (footnote omitted). Accordingly, in evaluating this factor, the time plaintiffs spent as employees for the company is properly included as part of the overall analysis.

Finally, our court considers whether the work was on a "project-by-project basis". *Carrell*, 998 F.2d at 332. Here, the work was. This counsels heavily in favor of IC status; and, in this instance, it persuasively counsels in favor of it.

Plaintiffs contend the up-and-down nature of the oil business supports showing the relationship was more, than less, permanent. But, plaintiffs were not paid during the down-period, and there was no guarantee they would receive more work.

Nevertheless, even if more work did come for plaintiffs, both sides have noted plaintiffs' skillset. Such a valuable skillset shows how the permanency

No. 17-51089

of the relationship may, in reality, be not all that permanent. *Cf. Usery*, 527 F.2d at 1314–15 (evaluating whether the laundry-operator plaintiffs were able to leave their work and transfer to new employment when they had "nothing to transfer but their own labor"); *McLaughlin*, 867 F.2d at 877 (noting how "specialized and widely-demanded skills" can lead to more "economic independence").

2.

The *Silk* factors being "non-exhaustive", other relevant factors may be in play in an employee *vel non* analysis. *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303). For summary-judgment purposes, the district court evaluated three additional factors: (1) the presence of an express agreement; (2) what the industry standard is for DDs; and, (3) the purpose of the FLSA. 280 F. Supp. 3d at 968–69. We consider them as well, as urged by plaintiffs. And, for the reasons stated *supra*, we reach the same conclusions as did the district court.

a.

First, it considered how the existence of an express agreement contemplating IC status factored into the employee *vel non* analysis. *Id.* at 968. Citing well-established precedent from our circuit, the court, correctly, chose not to rely on any contractual agreement. *Id.*

In *Hopkins*, 545 F.3d at 346, our court considered how those agreements factor into the analysis. There, the employer contended "the [employees] contractually agreed to be, and actually believed themselves to be, [ICs]". *Id.* But, our court responded by re-stating how "[s]ubjective beliefs cannot transmogrify objective economic realities. A person's subjective opinion that he is a businessman rather than an employee does not change his status". *Id.* (alteration supplied by *Hopkins*) (quoting *Brock*, 814 F.2d at 1049). Again, the focus is on economic reality, not contractual language. *Id.* at 345–46.

No. 17-51089

Otherwise, an employer could easily evade the FLSA by simply confecting such agreements.

Similarly, *how* plaintiffs file tax returns has limited relevance in the economic-reality test. *See Brock*, 814 F.2d at 1044 (citation omitted) (noting the limited utility of subjective labels); *Hopkins*, 545 F.3d at 346 (same); *but see Carrell*, 998 F.2d at 334 (noting how plaintiff was classified on "income tax returns"). On the other hand, as discussed *supra*, *what* those tax returns contain may prove useful in evaluating certain *Silk* factors, such as profit and loss. *Carrell*, 998 F.2d at 333–34 (discussing plaintiff's tax returns' profits and losses).

b.

Next, the district court considered the industry standard ("due to the nature of oilfield work, it may be industry standard to employ some workers as [ICs]"), ultimately concluding it did not support IC status. 280 F. Supp. 3d at 968–69. Plaintiffs contend this item is "subsumed" in the *Silk* factors. To the extent the industry standard affects the objective economic reality of workers, as opposed to merely subjective viewpoints, it is relevant. *Brock*, 814 F.2d at 1043–44.

For the industry standard to be relevant in that fashion, it is best considered as a part of the other *Silk* factors. That is the manner in which it is analyzed in this opinion—as a part of the totality of the circumstances. *Id.* (noting the "totality of the circumstances" test). For example, in *Brock*, our court considered the "operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ" as part of its discussion of the permanency factor. *Id.* at 1054 (citations omitted). (Moreover, considering the industry standard as a separate factor tempts improperly allowing subjective opinions of employment status to creep into the analysis.)

c.

Finally, the district court considered the purpose of the FLSA and whether it was intended to cover well-paid, well-trained workers like plaintiffs. 280 F. Supp. 3d at 969. The court noted, and correctly rejected, Premier's assertion "that [p]laintiffs are not the sort of low-wage employees the FLSA is designed to protect". *Id.* The Supreme Court cautioned litigants over 70 years ago that "employees are not to be deprived of the benefits of the [FLSA] simply because they are well paid". *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.*, 325 U.S. 161, 167 (1945).

III.

For the foregoing reasons, the judgment is VACATED, and judgment is RENDERED for Premier.