# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2020

Lyle W. Cayce
Clerk

No. 19-50350

JOSEPH HOBBS, Individually And On Behalf Of All Others Similarly Situated; DRAKE FEENEY, Individually And On Behalf Of All Others Similarly Situated,

> Plaintiffs - Appellees

v.

PETROPLEX PIPE AND CONSTRUCTION, INCORPORATED,

> Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before JOLLY, SMITH, and COSTA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Joseph Hobbs and Drake Feeney are former pipe welders for Petroplex Pipe & Construction, Inc. Hobbs and Feeney brought this suit in federal district court, alleging that although they often worked more than forty hours per week for Petroplex, they were not paid overtime as required by the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* (FLSA). Following a bench trial, the district court held that Petroplex was liable to Hobbs and Feeney under the FLSA. Petroplex appeals, contesting only the district court's holding that Hobbs and Feeney were employees instead of independent contractors. We affirm.

No. 19-50350

I.

Petroplex is an oilfield contractors and services company located in Midland, Texas. Pioneer Natural Resources is one of Petroplex's clients for whom it provides its services. Beginning in February 2014, Pioneer asked Petroplex to provide pipe welding services at the locations where Petroplex was constructing oil treatment and storage facilities for Pioneer. Petroplex then hired Sam Hardcastle and Joseph Hobbs to perform pipe welding services. Although Hobbs and Hardcastle were initially hired as W-2 employees, Petroplex later reclassified them as independent contractors. This change in classification occurred after discussions between the pipe welders and Petroplex's president, T.R. Bridges. But nothing in the record indicates that the pipe welders ever signed a contract with Petroplex. Subsequently, Drake Feeney began to work as a pipe welder for Petroplex. Feeney worked for Petroplex from July 2014 to October 2014 and then left to work closer to home. Feeney returned to work for Petroplex in January 2016, and this time stayed with the company until June 2016. During his fourteen-month absence from Petroplex, Feeney provided pipe welding services to other companies. Hobbs worked continuously for Petroplex from February 2014 until January 2017.

Although Hobbs and Feeney worked primarily as pipe welders, in the course of the workweek, they would sometimes perform structural welding, complete maintenance jobs, and operate forklifts for Petroplex. Depending on the year, Petroplex paid the pipe welders at a straight hourly rate of either $70 or $80. The pipe welders testified that they did not negotiate their rate of pay. Typically, the pipe welders would work from 7:00 AM to 5:00 PM six days a week. And while they worked for Petroplex, neither Hobbs nor Feeney provided pipe welding services to other companies. Hobbs and Feeney, however, both testified about instances where they missed work for weeks at a time.

No. 19-50350

The welders supplied their own trucks, welding machines, beveling machines, grinders, torches, torch hoses, leads, jack stands, hand tools, levels and squares. The welders were also responsible for their own meals and housing. For this purpose, both Hobbs and Feeney purchased campers to live in while working for Petroplex. In their tax returns, Hobbs and Feeney listed themselves as self-employed and took thousands of dollars in deductions on work-related expenses. Petroplex paid for and supplied the welders with consumables, such as oxygen acetylene for coating, welding rods, buffing wheels, grinding disks, face shields, and sanding pads. Petroplex would typically spend about $500,000 on all of its equipment at each construction site. Petroplex would also compensate the pipe welders for the time they spent undergoing testing and certification by Pioneer.

Petroplex set the pipe welders' hours, and if they showed up late, sent them home for the day. The pipe welders also took their breaks and lunches at the same time as Petroplex's employees. But unlike Petroplex's employees, Hobbs and Feeney did not receive an employee handbook or uniforms. At first, Bridges was the person who oversaw the pipe welders and gave them instructions, such as which job assignments to complete each day. Over time, however, Hardcastle took on a supervisory role. After assuming this role, Hardcastle would divide up job assignments among the pipe welders, pull measurements on the welds, provide diagrams for the pipe welders, and send the pipe welders home when they showed up to work late. Hobbs's relationship with Petroplex ended after he showed up to work late and got into an argument with Hardcastle over Hobbs's attitude. Feeney's second stint with Petroplex ended after Hardcastle indicated that Petroplex was running out of work for him.

Hobbs and Feeney filed a FLSA collective action, alleging that Petroplex improperly classified them as independent contractors and that they should

3

No. 19-50350

have been paid overtime for hours worked in excess of forty hours per week.[1] The district court conducted a bench trial on September 4, 2018. Following the bench trial, the district court issued findings of fact and conclusions of law in which it held that the pipe welders were employees of Petroplex and that Petroplex was liable for violating the FLSA. The district court then entered final judgment in the amount of $101,600 in favor of the pipe welders. This timely appeal followed.

## II.

The FLSA requires employers to pay employees at least one-and-one-half times the regular hourly rate for hours worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a)(1). Independent contractors are exempt from such requirement. In determining employee/independent contractor status, the "relevant question is whether the alleged employee so economically depends upon the business to which he renders his services, such that the individual, as a matter of economic reality, is not in business for himself." *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 845 (5th Cir. 2010). This court utilizes "five non-exhaustive factors" to guide this inquiry. *See Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). These "economic realities" or *Silk*[2] factors are: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Id.* "No single factor is determinative. Rather, each factor is a tool used to gauge the

---

[1] Although several plaintiffs opted in to the collective action, the only plaintiffs remaining at the time the district court issued its findings of fact and conclusions of law were Hobbs, Feeney, and Benjamin Humphrey. The district court found that Humphrey's claims fell outside the applicable statute of limitations, a finding that is not challenged on appeal.

[2] *See United States v. Silk*, 331 U.S. 704 (1947).

No. 19-50350

*economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind." *Id.* (internal citations omitted).

Because the district court resolved this case following a bench trial, we review the district court's historical findings of fact for clear error. *See Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1044 (5th Cir. 1987) (citing Fed. R. Civ. P. 52(a)). The district court's findings as to the *Silk* factors are "based on inferences from fact and thus are questions of fact" that are also subject to the clearly erroneous standard of review. *See id.* But the district court's "ultimate determination of employee status is a finding of law subject to *de novo* consideration by this court." *Id.* at 1045.

"[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, "[i]f the district court's account of the evidence is plausible" in the light of the entire record, this court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74.

III.

The district court found, based on the underlying historical facts, that four of the Silk factors—control, investment, opportunity for profit and loss, and permanency—weighed in favor of employee status. The remaining factor—skill and initiative—it found to be neutral. We review those findings, keeping in mind that *Brock* requires us to afford the district court significant deference.

A.

We first consider the degree of control Petroplex exercised over the pipe welders. "Control is only significant when it shows an individual exerts such

5

control over a meaningful part of the business that [the individual] stands as a separate economic entity." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 381 (5th Cir. 2019) (quoting *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312–13 (5th Cir. 1976)).  The relevant determination is whether "the worker has a viable economic status that can be traded to other companies, keeping in mind that lack of supervision of the individual over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.* (cleaned up).

The district court found that this factor weighed in favor of employee status.  This finding was not clearly erroneous.  It is true, however, that Petroplex did lack control over certain aspects of the pipe welders' work.  For example, Pioneer determined the specifications for the pipe welders' work and inspected the welding, not Petroplex.  But overall, the record supports the district court's finding that the degree of control factor weighs in favor of employee status.  First, there is evidence that Petroplex regularly assigned the pipe welders' specific tasks and the hours to be worked.  Petroplex set the welders' schedule and typically required them to work from 7:00 AM to 5:00 PM.  The welders were sometimes required to work late, and Hobbs testified that he did not turn down assignments or refuse requests to stay late for fear it could lead to termination of his employment.  Hobbs additionally testified that, if the pipe welders showed up to work late, they would be sent home for the day.  And unlike the workers in *Parrish*, the welders testified that they never refused to work on assigned projects.  *Cf. id.* at 382 (degree of control factor favored independent contractor status where workers could turn down projects without repercussion).  Although Petroplex argues that Bridges' testimony supports the opposite conclusion, the district court was entitled to credit the welders' testimony instead of Bridges'.  We acknowledge that both Hobbs and Feeney testified about instances where they missed work for weeks

at a time, which militates against employer control of their schedule. Yet, this testimony does not sufficiently undermine the district court's finding that Petroplex significantly controlled the workers' schedule for us to conclude that the finding was clearly erroneous. Petroplex's control over the welders' schedule, combined with evidence that it would discipline the welders for arriving to work late, suggests employee status. *See Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) ("Several facts weigh in favor of employee status; for example, Sunland dictated the Welders' schedule, including the timing of their breaks[, and] Sunland assigned the Welders to specific work crews . . . .").

And the district court's specific finding that Hardcastle, "with the consent of Petroplex—and at its initial direction—" assigned tasks, disciplined the pipe welders when they arrived late, and provided the pipe welders more simplified diagrams is supported by the record. Hardcastle testified that, although Bridges initially assigned jobs to the pipe welders, at some point, those duties shifted to him. Further, Hardcastle testified that he had authority to take on supervisory duties, and Bridges testified he was aware Hardcastle was acting as a supervisor. Thus, it was reasonable for the district court to infer that Hardcastle provided the welders' instructions at the direction of Petroplex. And we agree with the district court that Hardcastle's diagrams provided more specific instructions than the blueprints and well plans discussed in *Thibault* and *Parrish*. Unlike the alleged employers in those cases, who provided the workers with basic outlines that did not include specifications, Hardcastle took Pioneer's diagrams and provided the welders with more specific instructions. *Parrish*, 917 F.3d at 381–82; *Thibault*, 612 F.3d at 847, 851. We thus conclude that Hardcastle's provision of these diagrams, combined with the other evidence of his day-to-day control over the

7

pipe welders' work, indicates that Petroplex, through Hardcastle, exercised a significant amount of control over the welding work.[3]

Finally, we conclude that it is significant to the degree of control inquiry that the district court found that, at times, Petroplex assigned the pipe welders with tasks other than pipe welding. Despite Petroplex's argument to the contrary, the district court's finding that Petroplex assigned the welders to tasks other than pipe welding is not clearly erroneous. Hobbs testified that, although his main job was pipe welding, Petroplex assigned him to perform work at its maintenance shop a handful of times and required him to sometimes drive a forklift. Similarly, Feeney testified that if pipe welding work was slow, Petroplex would occasionally pay him to do structural welding. We agree with the district court that evidence Hobbs and Feeney, at times, performed work other than pipe welding leans in favor of employee status. *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 665, 667 (5th Cir. 1983) (finding employee status where only fifty percent of welders' work was welding). Based on the foregoing evidence, we conclude that the district court did not clearly err when it found the degree of control factor to favor employee status.

## B.

We next consider the relative investments of the pipe welders and Petroplex. In considering this factor, "we compare each worker's *individual* investment to that of the alleged employer." *Hopkins*, 545 F.3d at 344. The district court found that the relative investments factor weighed in favor of employee status. Citing both *Parrish* and *Carrell*, the district court

---

[3] Although Hardcastle testified that "on occasion" other welders would make their own drawings, the record is clear that Hardcastle provided the vast majority of these diagrams. Thus, the district court's conclusion that Hardcastle provided these diagrams as part of his supervisory duties is plausible, and we will not disturb this finding on appeal.

No. 19-50350

determined that Petroplex's overall investment in the pipe construction projects, of which the record supports that the plaintiffs' welding work was an important part, was relevant. Based on *Parrish* and *Carrell*, the district court was entitled to make that determination.[4] Given the significant sums that Petroplex invested in those projects[5]—and notwithstanding the substantial sums invested by Hobbs and Feeney[6]—it was not clearly erroneous for the district court to conclude that this factor cut in favor of employee status.

Moreover, the district court still would not have clearly erred even if we view Petroplex's relevant investments narrowly, *i.e.*, as confined "to the specific job the employee undertakes." *Thibault*, 612 F.3d at 847. Here, the record demonstrates that Petroplex invested in the welders' work in the following ways: (1) it provided a forklift to move pipes; (2) it paid for welders' helpers to the tune of $14 per hour; (3) it paid, on average, $100 per day per welder in consumables; (4) it paid for forklift testing and safety school for the welders; and (5) it spent approximately $30,000 to outfit a welding shop. While those $14 per hour and $100 per day investments may seem insignificant at first blush, they add up to tens of thousands of dollars per welder when annualized for the fact that the welders worked, on average, from 7:00 AM to 5:00 PM six

---

[4] *See Parrish*, 917 F.3d at 383 ("Obviously, Premier invested more money at a drill site compared to each plaintiff's investments."); *Carrell*, 998 F.2d at 333 ("We further recognize that Sunland's overall investment in each pipeline construction project was obviously significant.").

[5] Petroplex would spend approximately $500,000 at each construction site.

[6] Hobbs utilized two welding trucks to provide his welding services. His first welding truck cost him approximately $30,000, he paid $7,000 to put a welding bed on it, and he paid $3,000 to put a welding machine on it. The second truck cost him $50,000, and he paid approximately $13,000 to put a welding machine on it. And he also spent hundreds of dollars on beveling machines, two grinders, and two torches. Like Hobbs, Feeney paid approximately $60,000 for a welding truck, $200 for a welding bed, $14,500 for a welding machine, and hundreds of dollars for other welding equipment. The welders were also responsible for their own meals and housing, and for that purpose, spent tens of thousands of dollars on campers.

days a week.[7] When adding in the other costs above, it was not clear error for the district court to conclude that the amounts invested by Petroplex exceeded the sums Hobbs and Feeney themselves invested.

Further, even though the district court did not clearly err when it found this factor to weigh in favor of employee status, it still afforded this factor little weight in its analysis. In *Parrish*, 917 F.3d at 383, which also involved work in the oil and gas industry, we accorded the investment "factor little weight, in the light of the nature of the industry and the work involved." We agree with the district court's conclusion to do so here.

C.

We now turn to consider whether Petroplex controlled the pipe welders' year-end opportunities for profit or loss. "In evaluating this factor, it is important to determine how the workers' profits depend on their ability to control their own costs. For that purpose, evidence gleaned from tax returns can be useful." *Id.* at 384 (cleaned up). This court has additionally looked to whether the putative employer's control over the worker's schedule and pay had the effect of limiting the worker's opportunity, as an independent contractor, for profit or loss. *See Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009).

The district court found that this factor weighed in favor of employee status because Petroplex fixed the pipe welders' hourly rate and schedule, the welders' year-end profits or losses did not depend on their ability to find other work, Petroplex would assign the welders other welding work when the pipe welding work slowed, and the pipe welders were paid the same rate without

---

[7] For example, assuming a 48-work-week year, a single welder's helper would cost approximately $40,000 per year if they worked hours commensurate to the welders. And, again assuming a 48-work-week year, Petroplex would have spent approximately $29,000 per welder per year in consumables. The record is not clear on the number of weeks per year Hobbs and Feeney worked, however.

respect to their level of certification.  But, as Petroplex notes, other evidence adduced at trial suggests that the pipe welders could in some ways control their own opportunities for profit or loss.  Specifically, there was testimony that the pipe welders controlled the costs of, for example, their business equipment; and moreover, they took advantage of tax deductions for such business related expenses.  We have previously concluded that similar evidence supported a finding of independent contractor status.  *See, e.g., Parrish*, 917 F.3d at 384–85; *Thibault*, 612 F.3d at 848–49.

Nonetheless, the record, as a whole, does not permit us to say that the district court erred when it found this factor to weigh in favor of employee status.  Both Hobbs and Feeney testified that they never negotiated their rate of pay.  Thus, although Bridges testified that when Hobbs and Hardcastle were first classified as independent contractors they negotiated their rate of pay, the district court's finding that Petroplex fixed the hourly rate of pay has support in the record.  We also find it irrelevant to the opportunity for profit or loss inquiry that the pipe welders could hypothetically negotiate their rate of pay because, under the economic realities test, "it is not what the [putative employees] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive."  *See Brock*, 814 F.2d at 1047.  And there is ample evidence in the record to support the district court's finding that the work schedule imposed by Petroplex severely limited the pipe welders' opportunity for profit or loss.  Feeney testified that the pipe welders regularly worked more than forty hours a week and that, on average, they would work from 7:00 AM to 5:00 PM six days a week.  Hobbs and Feeney additionally testified that given the hours they worked for Petroplex, it would have been unrealistic for them to have worked for other companies.  Although Hobbs and Feeney did testify about instances where they missed work for weeks at a time, they did not work for other companies during such time, which supports the

district court's finding that, as a matter of economic reality, the pipe welders' schedule precluded them from working for other companies. As in *Cromwell*, it is significant that the pipe welders' work schedule for Petroplex effectively prevented them from engaging in outside work. 348 F. App'x at 61.

We also agree with the district court that it is important to the opportunity for profit or loss inquiry that, during the years they worked for Petroplex, the welders' "year-end profits or losses did not depend on their ability to find welding work with other companies consistently or other work generally." As stated, Hobbs worked exclusively for Petroplex for almost three years, and Feeney worked for no other company when he worked for Petroplex. Thus, although in the years surrounding their work for Petroplex the pipe welders worked for multiple companies, they are unlike the pipe welders in *Carrell*, or the cable splicers in *Thibault*, who supplemented their income with work for outside companies while they were working for their putative employers. *Carrell*, 998 F.2d at 333–34; *Thibault*, 612 F.3d at 849. Feeney's testimony that, during downturns in the oil and gas industry, Petroplex would occasionally provide him with structural work and Hobbs's testimony that he would sometimes work in the maintenance shop further bolster the district court's conclusion that the welders' year-end profits did not depend on their finding outside work. To be sure, during Feeney's fourteen-month absence from Petroplex, he worked for other welding companies. But this single fact cannot lead us to conclude that the district court committed error when it found the pipe welders' year-end profits were independent from their need to find available welding work. Nor does it tip the scales of the opportunity for profit or loss factor to weigh in favor of independent contractor status. This conclusion is especially true in the light of Feeney's testimony that he did not leave Petroplex due to a lack of available work, but instead, left because he "had a good opportunity to go work closer to home and less hours." Respecting

the facts as the district court found them, we must say that in the light of the pipe welders' economic reality, the opportunity for profit or loss factor weighs in favor of employee status.

### D.

We will next consider the skill and initiative required of the pipe welders. "Greater skill and more demonstrated initiative counsel in favor of [independent contractor] status." *Parrish*, 917 F.3d at 385. Relevant to the initiative inquiry is the extent of discretion the worker has over his daily tasks and whether he must take initiative to find consistent work. *See id.*

Here, the district court found that although the pipe welders were highly skilled, they were not required to demonstrate initiative. "Pipe welding, unlike other types of welding, requires specialized skills." *Carrell*, 998 F.2d at 333. Indeed, Hobbs testified that pipe welds are "pretty complicated," and he and Feeney had to learn pipe welding skills by observing other pipe welders. Moreover, that the pipe welders were tested and certified in pipe welding demonstrates that they were highly skilled workers. *See id.* Thus, the district court did not err when it found that the pipe welding work performed by the plaintiffs required specialized skills.

Nor did the district court err when it found that the pipe welders' job did not require them to demonstrate significant initiative. Petroplex provided the pipe welders with their job assignments and Hardcastle's diagrams specified how the pipe welders were to complete their assigned tasks. Thus, as Petroplex concedes, the pipe welders' initiative was limited once on the job. And, unlike the pipe welders in *Carrell*, during the time period relevant to this dispute, Hobbs's and Feeney's success did not depend on their "ability to find consistent work by moving from job to job and company to company." *Id.* Instead, Hobbs worked steadily for Petroplex for nearly three years, and Feeney's fourteen-

month absence from the company was due to a desire to work closer to home, not lack of available work.

Although we are mindful that, in certain circumstances, a plaintiff's highly specialized skills could support a finding of independent contractor status even absent demonstrated initiative, we are unable to say that the district court clearly erred in finding this factor to be neutral.   As we have previously noted, unlike in some of our previous FLSA classification cases, Petroplex would occasionally pay the pipe welders for work that did not require them to use their highly specialized skills, which counsels against finding that this factor favors independent contractor status.  Thus, considering the totality of the circumstances, and respecting the district court's findings, we affirm the district court's finding that the skill and initiative factor is neutral.

E.

The final *Silk* factor to be considered is the permanency of the relationship.   Relevant to this factor is "whether any plaintiff 'worked exclusively'" for Petroplex, "the total length of the relationship," and "whether the work was on a 'project-by-project basis.'"  *Parrish*, 917 F.3d at 387. But ultimately, "[t]he inferences gained from the length of time of the relationship depend on the surrounding circumstances."  *Id.* The district court found that this factor supports employee status.

In evaluating this factor, the district court first found that the pipe welders were not hired on a project-by-project basis.  Although Petroplex points to evidence that could suggest that it hired the welders on a project-by-project basis, the district court's finding to the contrary is also plausible.  Petroplex could have up to a dozen construction projects going on at a time.  Feeney testified that Petroplex never told him that it was hiring him for a specific project and that if he finished an assigned task, he would go to Hardcastle for his next Petroplex assignment.   Hobbs testified that Petroplex would

sometimes move him from one of its jobs to the next Petroplex job. For example, if a pipe already in service cracked and needed to be repaired, Petroplex would occasionally pull Hobbs from a new construction project to complete an emergency maintenance job. This evidence is sufficient to support the district court's finding that Petroplex hired the pipe welders to work on all its pipe welding work as needed, and not on a project-by-project basis. We are unpersuaded by Petroplex's contention that it necessarily hired the pipe welders on a project basis because Pioneer hired Petroplex on a project basis. The key question is not whether Pioneer, Petroplex's customer, used Petroplex on a project basis but whether Petroplex hired its welders for only specific projects. Because evidence in the record supports the district court's finding that Petroplex hired the pipe welders to complete all available welding work, it did not clearly err when it made this finding.

The district court also found that Hobbs and Feeney worked exclusively for Petroplex during the relevant time period and that the total length of the relationship was indicative of employee status. As we have previously noted, the record supports the district court's finding that neither Feeney nor Hobbs worked for another company while they were working for Petroplex. Further, we agree with the district court that the pipe welders worked for Petroplex for a substantial period of time. Hobbs worked for Petroplex for almost three years and Feeney worked for Petroplex for four months and then six months. We find the length of the pipe welders' relationship with Petroplex to more closely resemble the tenure of the workers in cases where we have found the permanency of the relationship factor to weigh in favor of employee status than the tenure of the workers in cases where we have found independent contractor status. *Compare Robicheaux*, 697 F.2d at 666 ("The duration of the relationship was from ten months to three years for each [welder]—a substantial period of time—and except for insignificant work elsewhere, was

No. 19-50350

exclusive[ ]."); *with Carrell*, 998 F.2d at 332, 334 (finding independent contractor status where average number of weeks worked for the alleged employer varied from approximately three to sixteen weeks per year).

We recognize that Petroplex has presented evidence that casts doubt on whether this factor weighs in favor of employee status; that it is unusual for pipe welders to work for one company for as long as the pipe welders worked for Petroplex, that the pipe welders testified about instances where they took several weeks off from work at a time, that there was a fourteen-month gap in Feeney's employment with Petroplex, and that Feeney testified that he ended his employment with Petroplex due to what he perceived as a lack of available work. All of this evidence is relevant and probative of the subject. No doubt. Nonetheless, considering the totality of the circumstances surrounding the welders' employment relationship with Petroplex, we cannot reverse the district court for clear error when it laid out all of the evidence and found this factor to favor employee status. Besides evidence that Petroplex hired the pipe welders to complete all its pipe welding work and that the pipe welders worked solely for Petroplex, there is also evidence that during downturns in the oil and gas industry, Petroplex used its pipe welders for jobs other than pipe welding. This evidence, combined with the district court's findings that the pipe welders were not hired on a project basis, worked exclusively for Petroplex, and worked for Petroplex for a substantial period of time, demonstrates strong and sufficient evidence that the permanency of the relationship factor weighs in favor of employee status.

## F.

Because the *Silk* factors are non-exhaustive, we will also look to other factors to help gauge the economic dependence of the pipe welders. *Parrish*, 917 F.3d at 387. Petroplex argues that other facts indicative of independent contractor status are that the pipe welders did not wear uniforms, nor have

16

Petroplex vehicles, nor receive Petroplex's employee handbook. Though we agree that this evidence is indicative of independent contractor status, its significance pales in the light of the substantial evidence of economic realities supporting the district court's determination of employee status.

Both Petroplex and the pipe welders also ask us to consider the extent to which the pipe welders' work was "an integral part" of Petroplex's business. Other circuits, such as the Sixth and Tenth Circuits, include this consideration as an enumerated sixth factor in the economic realities test. *See, e.g.*, *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998). "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Acosta*, 915 F.3d at 1055. In support of its argument that the pipe welders were unimportant to its business, Petroplex points to Bridges' testimony that Petroplex is an oilfield services company that only began providing pipe welding services in 2014 at the behest of its client Pioneer. But, as the pipe welders note, Bridges also testified that approximately forty percent of its construction projects require welding and that Pioneer insisted Petroplex begin providing pipe welding and fabrication services for it. Thus, the record demonstrates that, although pipe welding is not the main focus of Petroplex's business, it is integral to Petroplex's relationship with its major client Pioneer. We therefore consider this factor neutral in our overall assessment under the economic realities test.

## IV.

We conclude by noting that this case is not the first occasion we have had to consider whether welders or workers in the oil and gas industry were employees under the FLSA. And several facts present here do bear some resemblance to the facts in *Carrell*, *Thibault*, and *Parrish*, in which we have held that the putative employees were in fact independent contractors; namely,

that the pipe welders invested a relatively significant sum in their welding equipment, were highly skilled workers, and took several thousands of dollars in business deductions on their taxes. Evidence that Feeney worked for other pipe welding companies during his fourteen-month absence from Petroplex provides additional support for a finding of independent contractor status. But *Brock* makes clear that our role on appeal after a bench trial is limited. To the extent the evidence was to be weighed, it was within the judgment of the district court to do so. Here, the district court found that the control, investment, opportunity for profit and loss, and permanency *Silk* factors all weighed in favor of employee status. And it found the skill and initiative factor to be neutral. Because we can discern no clear error in those findings, we conclude that, as a matter of economic reality, Hobbs and Feeney were Petroplex employees. Accordingly, the judgment of the district court is, in all respects,

AFFIRMED.