# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 11, 2022

Lyle W. Cayce
Clerk

No. 21-40496

Marcus Hargrave,

*Plaintiff—Appellant*,

*versus*

AIM Directional Services, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:18-CV-449

Before Richman, *Chief Judge*, and Costa and Ho, *Circuit Judges*.
Per Curiam:[*]

Marcus Hargrave alleges that AIM Directional Services, Inc. violated the Fair Labor Standards Act by failing to pay him overtime. The district court granted AIM summary judgment, concluding that Hargrave was an independent contractor rather than an employee covered by the FLSA. We agree with that conclusion, for largely the same reasons that we reached that

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-40496

result in *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369 (5th Cir. 2019). Accordingly, we affirm.

## I.

AIM "provides oil and gas directional drilling, horizontal drilling, mud-motor drilling, and measurement while drilling services and tools to various clients." To conduct its drilling operations, AIM employs directional drillers. Directional drillers "guide the path of drilling" and provide advice on how to most effectively implement the well plan provided by AIM's clients, which functions as the general guideline for drilling operations. Directional drillers' work is complicated, sensitive, and crucial to AIM's business.

AIM hires some directional drillers as employees. But it also brings on independent contractors "as needed to meet the demands of fluctuating rig counts," either directly or through third-party staffing companies. All directional drillers have essentially the same duties and responsibilities while on the job, irrespective of how they are classified. But unlike AIM's employees, directional drillers brought on as independent contractors are free to accept or reject jobs as they please and are not required to sign non-compete or non-disclosure agreements. And while AIM's employees are salaried, independent contractors are paid on a day-rate basis. Independent contractors also receive none of the benefits and allowances provided to AIM employees, aside from a mileage reimbursement.

Marcus Hargrave has been a directional driller since 2006. From 2008 to 2018, he contracted with various oilfield services companies through his directional drilling consulting firm, Hargrave Oil Field Consulting, LLC.

In 2018, Hargrave interviewed with AIM. In the interview, AIM informed Hargrave that he would need to work with RigUp, a third-party staffing company, if he was interested in providing directional drilling

services to AIM as an independent contractor.  Shortly thereafter, Hargrave began working on directional drilling projects for AIM through RigUp. While on the job, Hargrave would submit timesheets to RigUp.  RigUp would then pay Hargrave and bill AIM for Hargrave's services.  Hargrave preceded to work on various projects for AIM from April to November of 2018, although there were points within that time period "where AIM did not have work for him" and encouraged him to "look around" for other opportunities.

Hargrave eventually filed this action, alleging that AIM violated the FLSA and the New Mexico Minimum Wage Act by improperly classifying him as an independent contractor and failing to pay him overtime.  The district court granted summary judgment to AIM after concluding that Hargrave was an independent contractor rather than an employee, and Hargrave timely appealed.[1]

## II.

We review a district court's grant of summary judgment de novo, applying the same standard as the district court.  *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).  *See also Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) ("We review de novo a district court's legal conclusion as to employment status in a grant of summary judgment.").  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

---

[1] On appeal, Hargrave does not challenge the district court's grant of summary judgment as to his claim under the New Mexico Minimum Wage Act.  He has therefore abandoned that claim.  *See Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993).

### III.

The FLSA "establishes a standard 40-hour workweek by requiring employers to pay 'time and a half' for any additional time worked." *Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 290 (5th Cir. 2021) (en banc) (citing 29 U.S.C. § 207(a)).  But "[i]ndependent contractors are exempt from [this] requirement." *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 829 (5th Cir. 2020).

To determine whether a given worker is an employee or an independent contractor, we must focus on "[e]conomic reality rather than technical concepts." *Goldberg v. Whitaker House Co-op.*, 366 U.S. 28, 33 (1961) (quotations omitted).  In making this assessment, our court generally uses "five non-exhaustive factors," known as the *Silk* factors, to "guide" the analysis:  "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Parrish*, 917 F.3d at 379 (quotations omitted).  These "factors should not be applied mechanically" and "no single factor is determinative." *Id.* at 380 (quotations omitted).  *See also Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (observing that "most employee-status cases" will have "facts pointing in both directions").

### A.

We start by assessing the degree of control AIM exercised over Hargrave. *See Parrish*, 917 F.3d at 381.  "Control is only significant when it shows an individual exerts such control over a meaningful part of the business that the individual stands as a separate economic entity." *Hobbs*, 946 F.3d at 830 (cleaned up).  Thus, the question is "whether the worker has a viable

economic status that can be traded to other companies." *Id.* (quotations omitted).

When on a job for AIM, the company "did not dictate" how Hargrave "completed [his] directional-drilling calculations." *Parrish*, 917 F.3d at 381. And while at each job he was "provided an already-designed well-plan," it was Hargrave that "made that plan work." *Id.* at 381–82. As in *Parrish*, these facts indicate that "the control factor leans in favor of [independent contractor] status." *Id.* at 381.

Hargrave argues that AIM controlled his compensation because it set both the "method and rate of [his] pay." But that alone is unpersuasive given that Hargrave was "free to accept or reject jobs from AIM" as he pleased. Hargrave also contends that AIM exercised control over his "schedule and job assignments" because AIM told him "where to go and when" once he accepted a job. But again, Hargrave was free to pick and choose which job assignments to accept. And while AIM did assign Hargrave certain shifts while on the job, we have previously recognized that this sort of control does not militate in favor of employee status in this context, as firms like AIM "need to know" which directional drillers are "working at any given time." *See id.* at 382 (stressing that directional drillers must "work in concert with the rest of the drilling operation").

Next, Hargrave stresses that AIM required him "to work the entire duration of the job assignment himself and precluded him from subcontracting his work out." But while "[p]reventing subcontracting is an exercise of control," it "is not dispositive here." *Id.* at 385. That's because it is reasonable "for a company to want to hire a specific person," particularly for roles that require "advanced skill and specialized expertise." *Id.*

Finally, Hargrave places great emphasis on the fact that AIM forced him to "comply with . . . safety protocols and procedures," and "strongly

encouraged" him to wear "personal protective equipment with the AIM logo on it" while on the job. But as the district court observed, encouraging workers "to wear a hard-hat with an AIM logo" and mandating compliance with "safety policies and procedures that are generally required for safe operations on an oil-drilling site [is] not the type of control that counsels in favor of employee status." *See id.* at 382.

## B.

We now turn to the relative investments of AIM and Hargrave. *See Hobbs*, 946 F.3d at 831. This factor "compares the amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 847 (5th Cir. 2010).

AIM observes that Hargrave provided his own laptop, office supplies, safety equipment, and transportation for his work with AIM. However, for each project Hargrave worked on, AIM provided him with living quarters and the requisite drilling equipment and computer software. We therefore agree with the district court that "AIM clearly invested more money in the directional drilling projects Hargrave worked on."

But while this factor favors employee status here, we accord it "little weight, in the light of the nature of the industry and the work involved." *Parrish*, 917 F.3d at 383 (noting that directional drilling firm's "significant" investment "at a drill site" was necessary for directional drillers to be "able to complete the job").

## C.

"The third determination is the degree to which the worker's opportunity for profit or loss is determined by the alleged employer." *Id.* at 384 (quotations omitted).

"In evaluating this factor, it is important to determine how the workers' profits depend on their ability to control their own costs." *Hobbs*, 946 F.3d at 832 (quotations omitted). While AIM had a set day rate for the directional drillers it contracted with, Hargrave still "made decisions affecting [his] expenses." *Parrish*, 917 F.3d at 384. Indeed, Hargrave admits that he paid "for some of the vehicles, tools, equipment, and consumables" necessary to perform his work for AIM. *See Carrell*, 998 F.2d at 332 (welders' profits hinged on their ability "to minimize welding costs" given that they were responsible for "all costs associated with . . . their welding equipment"). Hargrave was then able to deduct these expenses from his taxes.[2]  *See Parrish*, 917 F.3d at 384–85 (deducting business expenses is indicative of independent contractor status). Moreover, unlike AIM's employees, Hargrave did "not receive any pay from" AIM when he was not "working on one of its projects." *Id.* at 384. This all militates in favor of finding that Hargrave had sufficient control over his profits and losses for this factor to support independent contractor status. *See id.*

Also relevant is "whether the putative employer's control over the worker's schedule and pay had the effect of limiting the worker's opportunity, as an independent contractor, for profit or loss." *Hobbs*, 946 F.3d at 832. Hargrave asserts that "the demands of AIM's schedule effectively prevented [him] from finding other [directional drilling] work due to the number of hours he worked and the 'on call' nature of the job assignments." But the record does not support that conclusion. Hargrave was not required to sign a non-disclosure or non-compete agreement, and

---

[2] We acknowledge that there is at least some ambiguity in the record as to whether Hargrave filed taxes in 2018, the year he worked for AIM, because Hargrave provided inconsistent answers on that issue in his deposition testimony. However, we would still conclude that this *Silk* factor weighs in favor of independent contractor status even if Hargrave did not, in fact, deduct any business expenses that year.

was "free to find additional . . . work." Indeed, AIM encouraged him to do just that at times. Hargrave chose instead to use the "gap periods where AIM did not have work for him" to fish and "enjoy life." That is a far cry from cases where "as a practical matter the work schedule . . . precluded significant extra work." *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009) (per curiam).

**D.**

We also consider "the skill and initiative required in performing the job." *Hobbs*, 946 F.3d at 829. "As a part of this inquiry, whether plaintiffs have some unique skill set, or some ability to exercise significant initiative within the business is, for obvious reasons, evaluated." *Parrish*, 917 F.3d at 385 (cleaned up). "Greater skill and more demonstrated initiative counsel in favor of independent contractor status." *Hobbs*, 946 F.3d at 834 (cleaned up).

Hargrave argues he is not "highly skilled" for our purposes because AIM failed to establish that he was more skilled than AIM's directional driller employees. But our court has "decline[d] to require [that] plaintiffs, as putative ICs, be more skilled than their employee counterparts." *Parrish*, 917 F.3d at 386 ("[A] company with a highly-skilled general counsel can still hire an outside lawyer as an IC, even if the general counsel is a more skilled lawyer.") (cleaned up).

After reviewing the record, we agree with the district court that Hargrave is "highly skilled." By the time Hargrave began his work with AIM, he had more than a decade of experience carrying out the "complicated work" of a directional driller. *Id.* And by Hargrave's own admission, that experience enabled him to develop an "expertise," which he used to provide advice on the best way to implement a well plan, and to propose solutions to problems as they arose. Hargrave's "high-skill level,

understood in the light of [his] complicated work, weighs heavily in favor of" finding he was an independent contractor. *Id.* *See Carrell*, 998 F.2d at 333 (5th Cir. 1993) (concluding pipe welders' "specialized skills" supported independent contractor status).

That still leaves the matter of whether Hargrave had the "ability to exercise significant initiative within the business." *Parrish*, 917 F.3d at 385 (cleaned up). In making this assessment, we generally assess whether the "major components" of the business that are open to initiative are within the plaintiff's control. *See Hopkins*, 545 F.3d at 345 (quotations omitted). *See also Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (noting plaintiff-salesman controlled "major components" of the business, such as "the methods of marketing and sales" and "the choice of other products to sell"). AIM asserts that Hargrave "showed initiative in starting and operating his own consulting firm [prior to working with AIM], investing in his equipment and tools, and managing his own finances." But we are not convinced that the record "demonstrate[s] the sort of initiative compelling nonemployee status." *See Parrish*, 917 F.3d at 386. If anything, it seems Hargrave's "initiative was limited once on the job." *Hobbs*, 946 F.3d at 834.

That said, this factor "is viewed by the totality of the circumstances." *Parrish*, 917 F.3d at 386. *See Hopkins*, 545 F.3d at 345 ("Generally, we look for some unique skill set *or* some ability to exercise significant initiative within the business.") (citations omitted and emphasis added). And ultimately, Hargrave's "specialized skill . . . persuades us to hold this factor leans in favor of [independent contractor] status." *Parrish*, 917 F.3d at 386.

## E.

We now turn to the final *Silk* factor: the permanency of the relationship. *See id.* Relevant here is whether Hargrave "worked exclusively" for AIM, "the total length of the relationship," and "whether

the work was on a project-by-project basis." *Hobbs*, 946 F.3d at 834 (quotations omitted).

The district court found that Hargrave's relationship with AIM was "non-exclusive because AIM did not require Hargrave to sign any non-compete or non-disclosure agreement." But given that the analysis "is focused on economic reality" rather than "economic hypotheticals," whether Hargrave "*could* have worked for other directional-drilling companies . . . is not a relevant concern." *Parrish*, 917 F.3d at 387. And it is undisputed that Hargrave "generally did not contract with other directional-drilling companies" while working with AIM. *Id.*

We next consider the total length of the relationship. In our view, the district court was correct to conclude that "Hargrave's working relationship with AIM" was "short-lived." His work for AIM spanned a six-month period, notably shorter than the "substantial period[s] of time" that we have previously found indicative of a more permanent relationship. *See, e.g.*, *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983) ("The duration of the relationship was from ten months to three years for each [welder]—a substantial period of time—and except for insignificant work elsewhere, was exclusive[ ]."). Moreover, as mentioned, there were multiple "gap periods" within that time where AIM "did not have work for" Hargrave.

Hargrave's work was also on a "project-by-project basis," *Carrell*, 998 F.2d at 332, which "counsels heavily in favor of [independent contractor] status," *Parrish*, 917 F.3d at 387. Hargrave contends otherwise because he worked on many AIM projects and did not have to formally re-apply for each one. But "[t]he key question" is whether AIM hired Hargrave "for only specific projects" or whether it hired him "to complete all available [directional drilling] work." *Hobbs*, 946 F.3d at 835. Before the

district court, Hargrave acknowledged that AIM engaged him "to work a project . . . from the start of drilling until completion," at which point AIM would offer him a new project—through RigUp—if one was available. So while AIM "made an effort to move [Hargrave] to subsequent projects," *Carrell*, 998 F.2d at 332, there is no meaningful dispute that Hargrave's "work was on a project-by-project basis," *Hobbs*, 946 F.3d at 834 (quotations omitted).

All things considered, we believe this factor also leans in favor of finding that Hargrave was an independent contractor.

\* \* \*

For the foregoing reasons, we agree with the district court that Hargrave "was an independent contractor" and thus not subject to the FLSA's requirements. Accordingly, we affirm.